# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

JENNIE M. COOK,     )
          )
    Plaintiff    )
          )
  v.       )  1:16-cv-00207-JCN
          )
USAA CASUALTY    )
INSURANCE COMPANY,  )
          )
    Defendant   )

## MEMORANDUM OF DECISION
## ON MOTION FOR SUMMARY JUDGMENT

In this action, Plaintiff alleges that Defendant breached an insurance contract and unfairly resolved her insurance claim after her house was damaged by a fire. (First Amended Complaint, ECF No. 8.) The matter is before the Court on Defendant's motion for summary judgment. (ECF No. 100.)

Following a review of the record, and after consideration of the parties' arguments, the Court grants in part and denies in part Defendant's motion.

### PROCEDURAL BACKGROUND

Plaintiff filed her complaint in Maine Superior Court alleging a claim for breach of contract and an unfair claims settlement claim. (Complaint, ECF No. 1-2.) Defendant removed the case to federal court based on diversity jurisdiction. (Notice of Removal, ECF No. 1.) Plaintiff subsequently filed a motion to amend the complaint, which motion the Court granted. (Motion and Order, ECF Nos. 6 – 7.)

In her amended complaint, Plaintiff alleged: (1) breach of contract claiming that she was entitled to the full repair or replacement value of the loss and to additional fair rental value payments; (2) unfair claims settlement practices; (3) negligence; and (4) negligent misrepresentation regarding coverage for ordinances and building codes. (Amended Complaint, ECF No. 8.) In her response to the motion for summary judgment, Plaintiff sought to dismiss the negligence and negligent misrepresentation claims. (Opposition to Motion for Summary Judgment at 4, ECF No. 114.)

After the close of discovery, Defendant filed a motion for summary judgment. (Motion, ECF No. 100.) At the hearing on the motion, Plaintiff raised for the first time a potential jurisdictional issue. Plaintiff then filed a motion to amend the complaint, a motion to join an indispensable party, and a motion to remand the matter to state court. (Motions, ECF Nos. 125 – 127.) The Court denied the motions. (Order, ECF No. 157.)

Plaintiff's counsel subsequently moved to withdraw (Motion, ECF No. 165) and Plaintiff moved to stay the proceedings. (Motions to Stay, ECF Nos. 159, 162.) The Court granted the motion to withdraw and denied the motion to stay, but the Court permitted Plaintiff the opportunity to file a motion to supplement her summary judgment filing. (Order, ECF No. 168.) Plaintiff then requested leave to amend her opposition to Defendant's motion for summary judgment. (Fourth Amended Motion for Leave to File Amended Opposition, ECF No. 191; Plaintiff's Supplemented Opposition, ECF No. 190-3.) The Court granted Plaintiff leave to amend her opposition. (Order, ECF No. 192).

Defendant filed a memorandum in reply to the supplemental opposition.[1] (Reply, ECF No. 194.)

A.     **The Property and the Policy**

In October 2012, Plaintiff contacted Defendant to secure a Rental Dwelling Policy on real property located at 188 Veazie Street, Old Town, Maine (the Property). (Defendant's Statement of Facts ¶ 1, ECF No. 101, hereinafter DSMF.)  Plaintiff originally purchased the Property with her husband in 1984 as their primary residence.  (Plaintiff's Additional Statement of Material Facts ¶ 137, ECF No. 113, hereinafter PASMF.)  Plaintiff is a trained and experienced real estate appraiser, and she describes the Property as a beautiful, older, Victorian or Colonial home.  (*Id.* ¶¶ 138 – 140.)  Plaintiff made a number of improvements to the Property.  (*Id.* ¶ 141.)  During Plaintiff's initial phone call with Defendant, Plaintiff discussed "characteristics of [the] house," and Defendant's representative then provided an estimated monthly premium and explained the application process.  (DSMF ¶ 2.)  No other matters were discussed on this call.  (*Id.*)  On November 16, 2012, Defendant issued Policy No. 00278416380A, insuring the Property.  (*Id.* ¶ 3.)  The initial coverage was made conditional on an inspection.  (PASMF ¶ 176.)

---

[1] The Court granted Defendant an opportunity to reply to Plaintiff's amended opposition; Defendant objects to Plaintiff's effort to amend not only her responsive legal argument, but also her responses to Defendant's statement of material facts. (ECF No. 194.)  As to Plaintiff's attempt to amend her response to Defendant's statement of material facts, Defendant's arguments are not without merit.  Plaintiff's amended opposition response includes a significant number of paragraphs which apparently change her position on many of Defendant's factual statements, referring to a separate document, "Cook's amended denial of USAA's Statement of Fact," which document does not appear in the record.  Furthermore, the paragraphs in which Plaintiff's position is changed regarding Defendant's factual statements do not comply with Local Rule 56. Nevertheless, the Court has considered Plaintiff's amended legal arguments.

On November 28, 2012, Mueller Inspections performed an inspection of the Property, which inspection revealed a series of "Condition Concerns," including extensive moss growth, particularly on the roof, as well as a crumbling chimney. (DSMF ¶ 4.) In March 2013, Plaintiff had a series of phone calls with an underwriter for Defendant in which they "talked about just the conditions and just some other safety conditions," and the underwriter addressed her questions related to increased coverage limits based on the inspection and repairs that would be needed in order to maintain coverage. (*Id.* ¶ 5.) After the inspections, Defendant increased the cost of replacement to $444,000. (PASMF ¶ 177.)

Tenants occupied the Property from July 2012 through July 2013. (DSMF ¶ 6.) The Property was vacant between from July 2013 to the date of the fire in September 2013. (*Id.* ¶ 7.) During this time, Plaintiff lived in Virginia. (*Id.* ¶ 11.)

## B. The Fire

On September 24, 2013 at approximately 7:00 a.m., a fire was reported at the Property. (*Id.* ¶ 16.) The Fire Department determined that the fire was confined to an area of approximately six square feet on the second-floor rear portion of the Property. (*Id.* ¶ 18.) The Fire Department estimated that "not much water" (less than 1,000 gallons) was used to extinguish the fire, and they were able to suppress it in a short period of time. (*Id.* ¶ 19.) The Fire Department's report reflects that only one story of the Property suffered any minor or serious damage, and that there was no heat damage on the first floor. (*Id.* ¶ 20.)

## C.    Water Mitigation and Initial Claim Estimate

At approximately 4:15 p.m. on September 24, 2013, Plaintiff called Defendant and advised that the Fire Department was performing water mitigation at that time.  (*Id.* ¶ 21.) Paul Davis Restoration (Davis) was a participant in Defendant's Property Direct Repair Program, the details of which program Defendant outlined in a letter to Plaintiff.  (*Id.* ¶ 22.)  On September 25, 2013, at 8:23 a.m., Plaintiff called Defendant, during which call the nature of Defendant's relationship with Davis was explained; Plaintiff consented to the retention of Davis to perform post-fire mitigation services.  (*Id.* ¶ 23.)

On September 25, 2013, Plaintiff and Davis entered into a contract to perform post-fire mitigation services.  (*Id.* ¶ 24.)  Joe Ouellette, a Davis representative, inspected the Property and documented its condition with a series of photographs.  (*Id.* ¶ 25.)  Plaintiff returned to Virginia on September 26, 2013.  (*Id.* ¶ 26.)

On September 27, 2013, Mr. Ouellette advised Defendant that the claim was a "fairly large loss."  (*Id.* ¶ 27.)  On the same day, the matter was assigned to Dennis McLaughlin, a general adjuster who handles losses in excess of $50,000.  (*Id.* ¶ 28.)  Mr. Ouellette advised Mr. McLaughlin that there was extensive fire damage in the second-floor back bedroom and hallway and "heat and smoke damage throughout the house."  (*Id.* ¶ 29.) Mr. McLaughlin also spoke with Old Town Fire Chief O'Malley about the origin and cause of the fire.  (*Id.* ¶ 30.)  Mr. McLaughlin called Plaintiff the same day to explain the claims process and documented that "she will be working with Paul Davis Restoration to do the repairs."  (*Id.* ¶ 31.)  Mr. Ouellette spoke with Defendant which authorized the start of the demolition and clean-up.  (*Id.* ¶ 32.)

On September 30, 2013, Mr. McLaughlin first inspected the Property. (*Id.* ¶ 33.) Mr. McLaughlin met with Mr. Ouellette at the Property to conduct a second inspection on October 3, 2013. (*Id.* ¶ 34.) On October 3, 2013, the reconstruction assignment under the Property Direct Repair Program was cancelled, as Mr. McLaughlin said he would write his own estimate. (*Id.* ¶ 35.) On October 3, 2013, Mr. Ouellette advised Contractor Connection that there were minimal water levels and that no dry out was needed. (*Id.* ¶ 36.) On October 7, 2013, Mr. Ouellette again advised Contractor Connection that water mitigation was not necessary. (*Id.* ¶ 37.) On October 9, 2013, Mr. McLaughlin prepared an initial estimate of structural damage and sent a check to Plaintiff, payable to her and her mortgage company, OCWEN Loan Servicing, LLC ("OCWEN") as follows:

| | |
|---|---|
| Replacement Cost: | $184,836.16 |
| Less Depreciation | ($55,557.71) |
| Actual Cash Value | $129,278.45 |
| Less Deductible | ($2,500.00) |
| Net Claim | $126,778.45 |

(*Id.* ¶ 38.) On October 10, 2013, Mr. McLaughlin spoke with Plaintiff and confirmed that all settlement documents had been sent and she would receive them soon. (*Id.* ¶ 39.)

On October 11, 2013, Keith Trembley, a Davis representative, advised Defendant that no water mitigation (fans and dehumidifiers) was needed and requested a cancellation of the water mitigation assignment. (*Id.* ¶ 40.)

## D.    Demolition and Cleaning

On October 11, 2013, Davis began the cleaning portion of the loss after Plaintiff called and provided Davis with verbal authorization to begin demolition and cleaning

services.  (*Id.* ¶¶ 41 – 42.)  On October 13, 2013, Davis began the demolition portion of the loss by tearing out wet and damaged material.  (*Id.* ¶ 43.)

On November 5, 2013, Mr. McLaughlin reviewed and paid Davis' invoice for structural cleaning and fire mitigation in the amount of $14,255.70.  (*Id.* ¶ 48.)  Payment was issued to Plaintiff, Davis, and to Plaintiff's mortgage company, OCWEN.  (*Id.*)  Mr. McLaughlin contacted Plaintiff to explain the amount being paid based on Davis' November 5, 2013 invoice and the services that had been rendered.  (*Id.* ¶ 49.)  Davis submitted an invoice in the amount of $15,005.61 for the cost of demolition, temporary power, plumbing repairs and debris removal.  (*Id.* ¶ 50.)  On November 15, 2013, Mr. McLaughlin received the invoice and paid Plaintiff, Davis, and OCWEN.  (*Id.* ¶ 51.)

On November 20, 2013, Mr. McLaughlin received and paid a board-up bill in the amount of $1,222, payable to Northeast Restoration, Plaintiff and OCWEN.  (*Id.* ¶ 52.)  On the same day, Mr. McLaughlin also received an asbestos removal and disposal estimate in the amount of $2,100 and issued payment to Davis, Plaintiff, and OCWEN.  (*Id.* ¶ 53.)  Several months later, on June 6, 2014, Davis forwarded a revised cleaning invoice.  (*Id.* ¶ 95.)  On June 9, 2014, Mr. McLaughlin prepared a revised estimate and issued payment for the additional structural damage in the amount of $3,373.98.  (*Id.* ¶ 98.)

E.    **Contractor Repair and Reconstruction Estimate**

In November 2013, Keith Trembley prepared an estimate for a rebuild of the Property; he presented a final estimate in February 2014.  (*Id.* ¶ 61.)  Plaintiff did not proceed with the rebuild.  (*Id.*)

On or about December 3, 2013, Plaintiff hired public adjuster, Todd Smith of Adjusters International. (*Id.* ¶ 64.) Mr. Smith never submitted an estimate to Mr. McLaughlin. (*Id.* ¶ 65.) Plaintiff at no time provided Mr. McLaughlin with an alternative structural repair estimate. (*Id.* ¶ 66.)

## F.    Fair Rental Value

Plaintiff sought to recover payment for the fair rental value of the Property while it was not suitable to rent. On October 16, 2013, at 7:55 a.m., CST, about three weeks after the fire, Plaintiff called Defendant and inquired about fair rental value coverage and was told there was a coverage question regarding the claim for rent, as the Property was not occupied by a tenant on the date of loss. (*Id.* ¶ 44.) At 8:17 a.m. CST, Plaintiff called Defendant again, spoke with a second representative, and asked about fair rental value coverage. (*Id.* ¶ 45.) During this conversation, Plaintiff was informed that there was no coverage for loss of rent. (*Id.*)

On November 22, 2013, at approximately 1:00 p.m., Plaintiff sent several messages to Mr. McLaughlin through the online "claims portal." (*Id.* ¶¶ 54 – 56.) Plaintiff requested clarification about whether she could recover depreciation if she spent the settlement funds on the Property, even if the money was not used for a specific line item, whether she could recover loss of rent, even if there was no tenant, and said she would fax a copy of her lease. (*Id.*) A few minutes later, Mr. McLaughlin responded to the series of messages and advised Plaintiff that she could make a claim for the recoverable depreciation provided the money was spent on repairs; he requested that Plaintiff send a copy of the prior lease and property management contract for evaluation of her fair rental value claim. (*Id.* ¶¶ 57, 60.)

On December 20, 2013, which was a Friday, Plaintiff informed Defendant that prior to the loss, Mr. Derek DeCeser - the owner of Mynt Investments - had an option to lease the Property "for whatever market rate was" or $700 per month, as well as an additional option to purchase the Property for $130,000. (*Id.* ¶ 67.) At approximately 5:23 p.m., Plaintiff sent a message to Mr. McLaughlin through the "claims portal" advising that Mr. Smith had failed to forward the correct information in furtherance of the fair rental value claim. (*Id.* ¶ 68.) Defendant's "claims portal" system confirmed receipt of the message and confirmed that a USAA representative would follow-up when normal weekday business hours resumed. (*Id.* ¶ 69.) On December 23, 2013, Mr. McLaughlin responded to Plaintiff's message regarding the documentation from Mr. Smith, confirmed receipt of the same documentation, and advised that he would review and respond. (*Id.* ¶ 70.)

On December 31, 2013, at approximately 8:16 a.m., Plaintiff sent a message to Mr. McLaughlin to ask about the status of her fair rental value claim. (*Id.* ¶ 71.) On December 31, 2013, at approximately 8:47 a.m., Defendant responded and advised Plaintiff that Mr. McLaughlin would return to the office on January 3, 2014. (*Id.* ¶ 72.) From approximately 10:23 p.m. to 11:09 p.m., Plaintiff sent four messages to Mr. McLaughlin containing six numbered paragraphs of questions related to the claim. (*Id.* ¶ 73.) On or about January 1, 2014, Plaintiff cancelled her contract with Adjusters International (Mr. Smith) and requested that Mr. McLaughlin no longer communicate with Mr. Smith. (*Id.* ¶ 74.) Plaintiff also sent a message to Mr. McLaughlin with additional questions related to her claim. (*Id.* ¶ 75.) On January 2, 2014, Mr. McLaughlin confirmed receipt of Plaintiff's inquiries and said he would review and advise. (*Id.* ¶ 76.)

On January 8, 2014, Plaintiff sent a message to Mr. McLaughlin stating that she would fax a letter to him with all her questions. (*Id.* ¶ 77.) On the same day, Plaintiff faxed nine-pages regarding certain terms, including Replacement Cost, Actual Cash Value, and Fair Rental Value. (*Id.* ¶ 78.) Plaintiff also sent a message to Mr. McLaughlin through the "claims portal" indicating she had just sent him a separate e-mail attaching the January 8, 2014 fax. (*Id.* ¶ 79.) On January 10, 2014, Mr. McLaughlin confirmed receipt of Plaintiff's inquiries and stated he would call her to discuss. (*Id.* ¶ 80.) On January 11, 2014, Mr. McLaughlin called and spoke with Plaintiff for about forty-five minutes and sent her a claims communication to confirm receipt of the January 8, 2014 correspondence. (*Id.* ¶ 81.) On January 15, 2014, Plaintiff sent a message to Mr. McLaughlin requesting documentation and other inquiries related to her claim, and on January 17, 2014, Mr. McLaughlin responded. (*Id.* ¶ 82.)

On January 28, 2014, Mr. McLaughlin extended fair rental value coverage, advised Plaintiff of the decision, and forwarded payment in the amount of $4,200 for the estimated period of restoration, which was six months from the date of loss. (*Id.* ¶ 83.) Several months later, on June 6 and June 9, 2014, Mr. McLaughlin agreed to pay an additional two months' fair rental value, bringing the total estimated period of restoration to eight months, and sent payment for the additional $1,400. (*Id.* ¶¶ 96 – 97.) Several months later, on October 27, 2014, Mr. McLaughlin forwarded an additional $1,400 payment for fair rental value, bringing the total fair rental value to ten months from the date of loss. (*Id.* ¶ 120.)

### G. Roof, Lead Abatement, and Other Claims Communications and Payments

Plaintiff also pursued several other issues with Defendant. On October 21, 2013, at 11:26 a.m., about one month after the fire, Plaintiff e-mailed Mr. McLaughlin with questions concerning coverage of damage to the back side of the roof. (*Id.* ¶ 46.) At 12:53 p.m., Mr. McLaughlin responded and confirmed that damage to the back side of the roof was covered in the October 9, 2013 payment. (*Id.* ¶ 47.)

On December 2, 2013, at 10:06 a.m., Plaintiff sent a message to Mr. McLaughlin with a question about how the deductible was applied on the most recent payment to Davis. (*Id.* ¶ 62.) On December 3, 2013, at 7:59 a.m., Mr. McLaughlin responded to Plaintiff's inquiry regarding application of the deductible. (*Id.* ¶ 64.)

Through January, March and April 2014, Plaintiff brought other issues to the attention of Mr. McLaughlin and Defendant. (*Id.* ¶ 84.) On April 22, 2014, Mr. McLaughlin issued a supplemental payment of $7,369.14, covering payment for the hardwood floor under the carpet and additional insulation. (*Id.* ¶ 85.)

On or about April 22, 2014, Plaintiff faxed a letter along with "many other documents" to Mr. McLaughlin regarding issues with the claim. (*Id.* ¶ 86.) Mr. McLaughlin confirmed receipt of the submission through the claims communications site, and following review, returned to the Property to conduct another inspection. (*Id.* ¶ 87.)

On or about April 25, 2014, Plaintiff faxed approximately seventy pages of documents to Mr. McLaughlin. (*Id.* ¶ 88.) On or about April 30, 2014, Plaintiff faxed an additional thirty-six pages of documents to Mr. McLaughlin, including a nine-page, single-spaced letter regarding issues with the claim and many pages of e-mail correspondence

between Plaintiff and various individuals.  (*Id.* ¶ 89.)  Mr. McLaughlin confirmed receipt of the submission through the claims communications site, and later discussed the letter with Plaintiff in-person at her home.  (*Id.* ¶ 90.)

On May 5, 2014, Mr. McLaughlin called the Department of Environmental Protection regarding Plaintiff's concerns over lead contamination.  (*Id.* ¶ 91.)  On the same day, Mr. McLaughlin scheduled a follow-up inspection with Plaintiff.  (*Id.* ¶ 92.)  On May 8, 2014, Plaintiff faxed sixteen pages of documents to Mr. McLaughlin, including a six page, single-spaced typed letter and several pages of e-mail correspondence.  (*Id.* ¶ 93.) On May 14, 2014, Mr. McLaughlin re-inspected the Property.  (*Id.* ¶ 94.)

Between June 9, 2014 and June 11, 2014, Plaintiff sent eleven e-mails to Mr. McLaughlin and Defendant.  (*Id.* ¶ 99.)  Mr. McLaughlin responded to every e-mail received from Plaintiff.  (*Id.* ¶ 100.)  Mr. McLaughlin returned every phone call from Plaintiff.  (*Id.* ¶ 101.)

## H.    Plaintiff Retains Counsel

On June 9, 2014, Plaintiff advised Mr. McLaughlin that she was seeking the advice of an attorney.  (*Id.* ¶ 102.)  On June 11, 2014, Mr. McLaughlin wrote to Plaintiff confirming that she was retaining an attorney and requested that she provide counsel's contact information.  (*Id.* ¶ 103.)  On June 16, 2014, Plaintiff advised Mr. McLaughlin that her attorney was Joe Ferris.  (*Id.* ¶ 104.)

After retaining counsel, Plaintiff continued to contact Defendant directly.  (*Id.* ¶ 105.) Mr. Ferris advised Mr. McLaughlin that communication was to go through his office.  (*Id.* ¶ 106.)  Mr. Ferris and Mr. McLaughlin communicated several times in July 2014.  (*Id.*

¶ 107.)  Although Plaintiff was represented by counsel, and counsel advised that all communications should go through counsel, Plaintiff continued to contact Defendant directly in July, August and September 2014.  (*Id.* ¶ 108.)

On September 5, 2014, Plaintiff sent an e-mail to Defendant stating that she was not permitting her lawyer to contact Mr. McLaughlin until Defendant took certain actions relating to payments to her mortgage company, OCWEN.  (*Id.* ¶ 109.)  On September 8, 2014, counsel advised that Defendant could communicate directly with Plaintiff.  (*Id.* ¶ 110.)  On September 9, 2014, a stop-pay was issued for the $126,778.45 check and reissued payable to Plaintiff and OCWEN Loan Servicing.  (*Id.* ¶ 111.)

On or about September 24, 2014, Plaintiff requested and received a payoff quote from OCWEN reflecting the total amount of $140,868.66 needed to satisfy the balance of the loan.  (*Id.* ¶ 112.)  In or about October 2014, shortly after receiving the check reissued on September 9, 2014, as well as the September 24, 2014 payoff quote, Plaintiff paid off her mortgage with OCWEN.  (*Id.* ¶ 113.)  As part of the payment, Plaintiff endorsed to OCWEN at least two of the checks Defendant had issued.  (*Id.* ¶ 114.)

## I.      Lead and Asbestos Report and Final Claim Estimate

On October 3, 2014, about one year after the fire, Defendant received Donan Engineering's report dated September 26, 2014 concerning the presence of asbestos.  (*Id.* ¶ 115.)  On October 9, 2014, Defendant provided Plaintiff with a copy of the Donan Engineering Report and requested the updated lead findings.  (*Id.* ¶ 116.)  On October 27, 2014, Defendant received an updated Donan Engineering report containing the lead findings provided by Plaintiff.  (*Id.* ¶ 117.)

The same day, on October 27, 2014, Mr. McLaughlin updated his overall estimate based on the most recent Donan Engineering Report and forwarded a $17,857.02 supplemental payment to Plaintiff. (*Id.* ¶¶ 118 – 119.) Mr. McLaughlin's explanation of the loss was as follows:

| | |
|---|---|
| Replacement Cost: | $244,944.33 |
| Less Depreciation | ($56,794.43) |
| Actual Cash Value | $187,149.90 |
| Less Deductible | ($2,500.00) |
| Net Claim | $184,649.90 |

(*Id. See also* Letter, ECF No. 105-16.)

## J.    Commencement of Litigation

On August 5, 2015, Plaintiff's attorney, Joe Ferris, requested an extension of the policy's two-year "Suit Against Us" provision and forwarded a proposed Tolling Agreement for Defendant's review. (*Id.* ¶ 121.) Plaintiff called Defendant the same day and had a lengthy conversation with a representative regarding various concerns about her claim. (*Id.* ¶ 122.) On August 10, 2015, Plaintiff called Defendant upset that Mr. McLaughlin contacted her attorney and advised that only a manager was authorized to speak with her attorney. (*Id.* ¶ 123.) On August 17, 2015, Mr. McLaughlin sent the signed Tolling Agreement to Plaintiff's counsel. (*Id.* ¶ 124.)

On February 25, 2016, Plaintiff called Defendant to advise that she was considering discharging her attorney. (*Id.* ¶ 125.) On March 14, 2016, Plaintiff called Defendant to advise that she was changing lawyers. (*Id.* ¶ 126.) On March 16, 2016, Plaintiff's then attorney (Matthew Warner) contacted Defendant for the first time. (*Id.* ¶ 127.) On March 25, 2016, Plaintiff filed a complaint in Maine Superior Court (Kennebec County) against

Defendant, in which complaint she asserted claims for breach of contract and unfair claims settlement practices. (ECF Nos. 1-2, 1-3.) Defendant subsequently removed the case to federal court, citing the Court's diversity jurisdiction over the matter. (ECF No. 1.)

## K.    Mr. McLaughlin's Deposition Testimony

During the discovery process, Mr. McLaughlin said that as a general adjuster of large losses for Defendant, he takes the contract and best interests of the insureds into account while trying to assist them in the claims process. (PASMF ¶¶ 147 – 51). As a matter of course, Mr. McLaughlin does not make requests for sworn statements or a sworn proof of loss from insureds, and he did not make any such request of Plaintiff. (*Id.* ¶¶ 152 – 53.)

Mr. McLaughlin uses Defendant's Xactimate computer program in preparing estimates for adjusting claims, as Defendant requires all of its large loss adjusters to use the program. (*Id.* ¶ 157.) Mr. McLaughlin has no knowledge of the underlying functioning of the program. (*Id.* ¶ 158.) While there is a line item in Xactimate for a three-coat plaster over metal lath, in preparing his estimate Mr. McLaughlin chose acoustic plaster over Gypsum blue board because he believed that it is the most similar modern material that could be used to replace Plaintiff's damaged walls. (*Id.* ¶¶ 159 – 60.)

## L.    Plaintiff's Expert Evidence

Bruce Knowlton, a building contractor and licensed senior public adjuster, described the scope of the work to be done on the Property and prepared an estimate for the reconstruction of the Property in the approximate amount of $460,000, which estimate did not include the cost of remediation. (*Id.* ¶¶ 161 – 64.) Mr. Knowlton explained that

there can be discrepancies between estimates of adjusters based on different assumptions and there can be differences between contractors' estimates and those of adjusters. (Knowlton Deposition at 40 – 42, ECF No. 113-1.) Mr. Knowlton characterized the dispute between the parties as one involving whether the proper remediation steps were done. (Knowlton Deposition at 77.) Mr. Knowlton asserted that an insured could not move forward on repairs until loss mitigation had been undertaken and an agreement as to the scope of repairs is reached with the insurance company. (PASMF ¶ 174.)

Mark Coleman opined as to water damage, mold contamination, and lead contamination within the Property. (*Id.* ¶¶ 166 – 67.) Mr. Coleman provided an estimate in the approximate range of $105,000 for remediation necessary to prepare the site for a general contractor to commence reconstruction work. (*Id.* ¶ 168.)

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the Court] to determine whether either of the parties deserves

judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy,* 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial-worthy controversy exists and summary judgment must be denied as to any supported claim. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 – 24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

DISCUSSION

## A.    Breach of Contract

In her amended complaint, Plaintiff alleges that Defendant "was contractually obligated to pay the replacement cost without deduction for depreciation," but that Defendant "refused to cover the full replacement value of the loss and refused to cover fair rental value of the home for the full duration that the home was not fit to live in." (Amended Complaint ¶¶ 8, 9.)

The elements of a breach of contract action in Maine are "(1) breach of a material contract term; (2) causation; and (3) damages." *Me. Energy Recovery Co. v. United Steel*

17

*Structures, Inc.,* 1999 ME 31, ¶ 7, 724 A.2d 1248. "The interpretation of a contract, including whether or not its terms are ambiguous, is a question of law . . . ." *Farrington's Owners' Ass'n v. Conway Lake Resorts, Inc.*, 2005 ME 93, ¶ 10, 878 A.2d 504, 507. "[W]hen interpreting a contract, a court needs to look at the whole instrument." *Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 2003 ME 6, ¶ 12, 814 A.2d 989, 993. Accordingly, courts "will interpret a contract according to the plain meaning of its language, and will avoid any interpretation that renders a provision meaningless." *Richardson v. Winthrop Sch. Dep't*, 2009 ME 109, ¶ 9, 983 A.2d 400, 403 (internal citation omitted). "The interpretation of ambiguous language in a contract, however, is a question of fact." *Id.* Language is ambiguous if it is susceptible to more than one reasonable interpretation. *Id.* If a material term is ambiguous, a factual inquiry is required and the finder of fact must consider extrinsic evidence of the parties' intended meaning. *Bangor Pub. Co. v. Union St. Mkt.*, 1998 ME 37, ¶ 6, 706 A.2d 595, 597.

A few additional principles apply in the insurance context. "The meaning of language used in insurance contracts is a question of law." *York Ins. Grp. of Maine v. Van Hall*, 1997 ME 230, ¶ 8, 704 A.2d 366, 369. Ambiguous terms are generally construed in favor of the insured and against the insurer. *Id.* Courts are to "view the contract language from the perspective of an average person, untrained in either the law or the insurance field, in light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured. *Peerless Ins. Co. v. Wood*, 685 A.2d 1173, 1174 (Me. 1996). The insured bears the initial burden of showing that coverage for the injury exists, then the insurer bears the burden of showing that there is an exclusion from coverage, and the

insured then bears the burden of showing there is an exception to an exclusion. *Middlesex Mut. Assur. Co. v. Fish*, 738 F. Supp. 2d 124, 132 (D. Me. 2010).

### 1. Repair or Replacement Cost

The parties agree that the fire was a covered loss, but they dispute the proper basis of recovery. In the ordinary homeowner's insurance policy, there are two bases upon which an insured can recover for a loss: actual cash value and replacement cost. *See Gilbert v. Gilbert*, 2002 ME 67, n.2, 796 A.2d 57, 59; 46 C.J.S. Insurance § 1756. Repair or replacement cost "is an estimate of the amount it would cost to restore a damaged structure to its prefire condition." *Boudreau v. Manufacturers & Merchants Mut. Ins. Co.*, 588 A.2d 286, 288 (Me. 1991). Actual cash value "means the replacement cost of an insured item of property at the time of loss, less the value of physical depreciation as to the item damaged." 24-A M.R.S. § 3004-A. According to at least one Maine court, the reduction for physical depreciation "makes sense because the policyholder is to be restored to the position it was in before the covered loss." *Cliff House & Motels, Inc. v. Commercial Union York Ins. Co.*, No. CIV.A. CV-01-311, 2002 WL 31235885, at *1 (Me. Super. Sept. 16, 2002). In other words, unless an insured has paid for the additional coverage and met the conditions for the insured to recover for the full replacement cost, the actual cash value of a loss accounts for depreciation because "[i]t would be unjust and not part of the bargain to require the insurance companies to pay for a brand new building to replace one that might have had a roof in need of replacing or windows and floors that had substantial wear and tear." *Id.* Here, Plaintiff alleges she is entitled to full repair or replacement cost; Defendant maintains that the summary judgment record establishes that Plaintiff cannot

recover the full repair or replacement cost because she did not commence and thus not complete the repairs.

Under the replacement cost loss settlement provisions of the policy, (*see* Policy at 14, Condition 5-b-(1), (5), ECF No. 101-2), when a damaged building is fully insured:

> [Defendant] will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:
>
> > (a) the limit of liability under this policy that applies to the building;
> >
> > (b) the replacement cost of that part of the building damaged for like construction and use on the same premises; or
> >
> > (c) the necessary amount actually spent to repair or replace the damaged building.

(Condition 5-b-(1).)[2]  The policy restricts an insured's ability to recover for a loss on a repair or replacement cost basis: "[Defendant] will pay no more than the actual cash value of the damage unless: (a) actual repair or replacement is complete . . . ."  (Condition 5-b-(4).)  Insureds need not wait until actual repair or replacement is complete to pursue some measure of recovery, however, because the policy provides that insureds may initially recover the actual value of a loss and "may then make claim within 180 days after loss for any additional liability on a replacement cost basis."  (Condition 5-b-(5).)

---

[2] The policy contains two different loss settlement provisions, one for a "fully insured" property and one for where the insurer and the insured share the costs of repair.  A property is commonly termed "fully insured" when the policy limit is at least 80% of the cost to replace the entire property; a separate coinsurance provision applies when the policy limit is less than 80% of the cost to replace the entire property.  *See generally Boudreau v. Manufacturers & Merchants Mut. Ins. Co.*, 588 A.2d 286, 287, 288 (Me. 1991).  The parties do not dispute which provision applies to this loss.

There is no genuine dispute regarding the question of whether the "actual repair or replacement is complete." The summary judgment record is clear that repair and reconstruction never commenced. Under the unambiguous terms of the policy, therefore, Defendant was never obligated to pay Plaintiff any more than the actual cash value of the loss. *See*, *Corner v. Farmers Ins. Exch.*, 899 F.2d 1224, 1990 WL 42270 at *2 – 4 (9th Cir. 1990) (affirming summary judgment in favor of insurer who paid actual cash value of loss but insured then sought recovery of repair or replacement cost without actually completing repairs); *Vakas v. Hartford Cas. Ins. Co.*, 361 F. App'x 1, 4 (10th Cir. 2010) (same); *Novogroder Companies, Inc. v. Hartford Fire Ins. Co.*, 528 F. App'x 644, 647 (7th Cir. 2013) (same).

Here, the uncontroverted record establishes that despite the fact Defendant paid Plaintiff on an actual cash value basis for the loss, Plaintiff did not make or even commence the repairs. To the extent Plaintiff argues that she could not commence the construction due to the dispute over the extent of the loss or the need for further loss mitigation, Plaintiff's argument is unavailing. The plain language of the policy controls. *See Woodhams v. Allstate Fire and Cas. Co.*, 453 Fed. App'x 108, 112 (2nd Cir. 2012) ("However understandable these reasons for delay in the undertaking of repairs [time for building permit to issue, road construction project], plaintiffs can point to no policy language obligating [defendant] to reimburse for repairs not commenced – let alone completed" within the time period required under the policy). Unless Plaintiff prevails on her argument that Defendant is estopped from relying on the express terms of the policy, which argument is addressed below, Defendant would be entitled to summary judgment on

Plaintiff's claim that she is entitled to the full cost of repair or replacement for the fire damage.

## 2.    Estoppel

Plaintiff argues that Defendant should not be able to rely on the policy provision conditioning replacement cost payment on the actual completion of repairs because Defendant's conduct prevented her from undertaking the repairs.  In other words, Plaintiff contends Defendant is estopped from relying on the policy language.

Estoppel "is an equitable affirmative defense that . . . preclude[s] a party 'from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse. . . .'" *Waterville Homes, Inc. v. Maine Dep't of Transp.*, 589 A.2d 455, 457 (Me. 1991) (quoting *Martin v. Me. Central R.R. Co.*, 83 Me. 100, 104, 21 A. 740 (1890)).  "Equitable estoppel requires a misrepresentation." *Dep't of Health & Human Servs. v. Pelletier*, 2009 ME 11, ¶ 18, 964 A.2d 630, 636.  A misrepresentation can be an affirmative misstatement, a combination of misleading statements, or silence when there is a duty to speak.  *Id.*; *Longley v. Knapp*, 1998 ME 142, ¶ 12, 713 A.2d 939, 943.  "Equitable estoppel is a doctrine that should be carefully and sparingly applied." *Dasha v. Maine Med. Ctr.*, 665 A.2d 993, 995 (Me. 1995) (internal quotation marks omitted).

While in some situations, Maine courts have granted insureds relief from policy language that would have limited their recovery because insurers misrepresented material facts causing insureds to omit steps that would otherwise have been necessary to recover

for their loss, *see Maine Mut. Fire Ins. Co. v. Watson*, 532 A.2d 686, 689 (Me. 1987) (when insurer's "blatant misrepresentation," caused delay in reconstruction because the insured never knew if the insurer would recognize the claim, "[t]o agree with the [insurer] would be to allow a party to take advantage of his own wrong, which we will not countenance"), the summary judgment record does not support such a finding in this case. Plaintiff evidently believes the contractors who performed cleanup and remediation efforts did not perform adequately regarding water infiltration, soot, lead, and asbestos, but Plaintiff has not demonstrated how Defendant's conduct, statements, or omissions were misleading or unfairly caused a delay in reconstruction.[3] Indeed, the record lacks any evidence of a material misrepresentation by Defendant. Plaintiff's estoppel argument, therefore, fails.

Accordingly, given that the record establishes that Plaintiff has not commenced and thus has not completed construction on the repairs, under the plain terms of the policy, Plaintiff has not demonstrated any facts upon which a fact finder could reasonably conclude

---

[3] The Policy provides coverage for debris removal and mitigation costs following a loss, which includes "necessary measures taken solely to protect against further damage." (Policy at 8 – 9, Other Coverages 2 and 6.) The record reflects that Plaintiff faults some of the contractor's decisions during its efforts to clean and protect the house from further damage, particularly the contractor's decisions involving lead testing, drying, and weatherizing windows and a damaged portion of the roof. (*See* Plaintiff's Deposition at 55-67, ECF No. 101-1.) Plaintiff evidently believes some of the decisions made it more difficult for her to initiate and complete reconstruction. (*Id.*) The uncontradicted evidence in the record, however, shows that Defendant promptly paid all the contractor's cleaning and mitigation estimates and invoices. Plaintiff's claims against the contractor and the contractor's claims against Plaintiff were litigated in a separate case in state court. (*Id.*) Plaintiff has not demonstrated any legal basis to support a determination that the contractor's alleged deficient work should be imputed to Defendant, or that Defendant is otherwise responsible for any disagreements or shortcomings during the time that Plaintiff and the contractor took "necessary measures . . . to protect against further damage" in the months following the fire. To the extent that there is a dispute as to the propriety of the mitigation measures, that dispute is not material to Plaintiff's claims against Defendant, including Plaintiff's estoppel argument.

that Defendant breached the parties' contract by not paying the full repair and replacement cost.

### 3. Calculation of Actual Cash Value of the Loss

Plaintiff asserts that even if she cannot recover the full repair or replacement cost, Defendant's assessment of the actual cash value is flawed and she is entitled to a recover a greater amount than Defendant paid. Defendant contends that Plaintiff did not allege such a claim.

Plaintiff contends that under principles of notice pleading, the amended complaint can reasonably be construed to assert a claim that Defendant failed to satisfy its contractual obligation to pay Plaintiff for her loss regardless of the measure of recovery. (Transcript of Oral Argument on Motion for Summary Judgment (Tr.) at 23, ECF No. 128.) At oral argument on the motion, Plaintiff asked the Court to permit an amendment to the complaint to assert the claim in the event the amended complaint is deficient. (Tr. at 23-24.) Defendant does not dispute Plaintiff's contention that Plaintiff has claimed in this case that Defendant's calculation of the loss was insufficient and that Defendant owed more money to Plaintiff. (Tr. at 15, 22.)

When assessing whether a party should be permitted to pursue a claim, a court must be mindful that the "failure to comply with Rule 8(a)(2)," which requires a short plain statement of a claim showing that the pleader is entitled to relief, "may render an unpleaded claim noncognizable" when discovered later. *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1171 (1st Cir. 1995). However, even when a party does not formally amend a pleading pursuant to Rule 15, in some circumstances, a pleading "may be constructively

amended as a case proceeds." *Id.* at 1172; *House of Flavors, Inc. v. TFG Michigan, L.P.*, 643 F.3d 35, 41 (1st Cir. 2011) (citing Fed. R. Civ. Pro. 15(b)). When a party asserts that a pleading has been constructively amended, courts focus on whether the opposing party had adequate notice of the claim. *Doral Mortg. Corp.*, 57 F.3d at 1171 ("The bottom line is simply this: while courts should construe pleadings generously, paying more attention to substance than to form, they must always exhibit awareness of the defendant's inalienable right to know in advance the nature of the cause of action being asserted against him.")

Regardless of whether the amended complaint can be construed to assert a claim for an additional actual cash value payment, the record establishes that the issue of whether Defendant paid an appropriate amount for the actual cash value of the loss has been an issue throughout discovery.[4] Defendant has been aware of Plaintiff's claim and thus Defendant would not be surprised or prejudiced by the inclusion of the claim in the case. In other words, to amend the complaint as Plaintiff requested at oral argument would not result in the inclusion of a "totally unpleaded, unlitigated claim in circumstances that threaten significant prejudice to a defendant." *Doral Mortg. Corp*. 57 F.3d at 1171. To the extent, therefore, that the amended complaint does not include a claim for an additional payment under Defendant's contractual obligation to pay the actual cash value of the loss, the amended complaint is amended to include the claim. Because the record includes

---

[4] The parties' procedural and discovery disputes during discovery also demonstrate that the Plaintiff has challenged the extent of the loss as determined by Defendant and not simply whether Defendant is obligated to pay the full repair or replacement cost. (*See e.g.*, Order on Request to Reopen Discovery, ECF No. 86; Order on Motion for Reconsideration, ECF No. 99.)

several disputed issues of fact regarding Defendant's calculation of the actual cash value of the loss, summary judgment on the claim is not warranted.

### 4. Fair Rental Value

Plaintiff contends Defendant "refused to cover fair rental value of the home for the full duration that the home was not fit to live in." (Amended Complaint ¶ 9.) Under the "fair rental value" provisions of the policy, if the insured property is "rented to others" or "held for rental" by the insured and becomes "unfit for its normal use" due to a covered loss, Defendant will make payments for the fair rental value. (Policy at 9, Condition D.) Defendant is obligated to cover fair rental value "for the shortest time required to repair or replace" the damaged portions of the rental property. (*Id.*) As the person claiming coverage, Plaintiff has the burden of establishing the claim is within the coverage of the insurance policy. *Fortin v. Titcomb*, 671 F.3d 63, 75 (1st Cir. 2012) (citing *Pelkey v. Gen. Elec. Capital Assurance Co.*, 804 A.2d 386, 387 (Me. 2011)). In addition, as the plaintiff in this action, Plaintiff has the burden of proving her claim by a preponderance of the evidence.

Under the terms of the policy, Defendant is not required to make fair rental payments indefinitely. The original estimate for the time to complete the repairs was six months. (DSMF ¶ 83.) Defendant subsequently paid the fair rental value for ten months. Plaintiff has not provided evidence (e.g., time estimate) that more than ten months was necessary to complete repairs to the Property. Plaintiff cannot preserve her fair rental value claim for trial by relying on the parties' dispute as to the proper scope of the repairs. If a disagreement over the scope of repairs, without more, were sufficient to survive summary

judgment, a trial would be required in nearly every dispute involving a fair rental value claim, regardless of the time period for which the insurer extended payments.

Not only has Plaintiff failed to present evidence from which a fact finder could reasonably conclude that a longer time was necessary to make the repairs, but the uncontroverted evidence is consistent with the ten-month period for which Defendant paid. Within two weeks of the fire, Defendant tendered a check to Plaintiff and her mortgage company in the amount of $126,778.45, which amount was based on replacement cost less depreciation. (DSMF ¶ 38.) Over the seven months immediately following the fire, Defendant paid Plaintiff a total of $164,630.90 for the replacement value less depreciation. (DSMF ¶ 85.)[5] Plaintiff, however, did not repair the Property.

In short, Plaintiff has provided no evidence to support a finding that the repairs required to make the property "fit to live in" would have taken more than ten months to complete had Plaintiff timely initiated repairs according to her preferred scope with the insurance proceeds paid by Defendant. Because Plaintiff has not presented facts that would support a finding that Defendant was required to pay the fair rental value for more than ten months after the fire, Plaintiff cannot prevail on her fair rental claim. *See Gilbert v. Gilbert*, 2002 ME 67, ¶ 21, 796 A.2d 57, 62 (in claim for damages for loss of use of a home damaged by fire, the plaintiff "failed to present evidence in his opposition to [the defendant's] summary judgment motion sufficient to establish that the four months . . . was not a

---

[5] Plaintiff "qualified" her response to the statement as follows: "The record references (incorporated by reference from paragraph 85) identify the payments made but do not support the description or characterization of the payments."

reasonably sufficient time in which to complete the repairs. Thus, the court did not err in entering a summary judgment in favor of [the defendant]"). Defendant, therefore, is entitled to summary judgment on Plaintiff's fair rental value claim.

## B.    Unfair Claims Settlement Practices Act

Maine's Unfair Claims Settlement Practices Act (UCSPA) generally prohibits insurers from making threats or knowing misrepresentations, failing to act within a reasonable time, or contesting liability or the amount of liability without a reasonable basis. 24-A M.R.S. § 2436-A; *see generally Curtis v. Allstate Ins. Co.*, 787 A.2d 760, 766 (Me. 2002). The summary judgment record lacks evidence of any threats, misrepresentations, unreasonable delay in claim processing, or unreasonable contest of liability. The uncontested evidence shows that Defendant promptly responded to Plaintiff's communications and remitted payments on the basis of actual cash value, as required by the policy. Plaintiff evidently maintains that Defendant's failure to pay the full repair and replacement cost constitutes a violation of the UCSPA.[6] (Plaintiff's Opposition at 32-34, ECF No. 114.) The UCSPA does not provide for recovery in an ordinary contract dispute; it "does not require the insurer to pay both undisputed and disputed amounts immediately upon demand." *Id.* Here, there is no "evidence demonstrating something more than a mere

---

[6] In her amended response to the motion for summary judgment, Plaintiff asserts that Defendant's representative misrepresented the coverage for the cost of removing asbestos roofing tile and that he later paid for the loss without informing Plaintiff. (Amended Response at 8-10, ECF No. 190-3.) Plaintiff contends that this was an effort to conceal coverage or the actual cash value payments from Plaintiff. (*Id.* at 9-10.) Plaintiff's assertions are not supported by the summary judgment record as required by the Federal Rules of Civil Procedure and the District of Maine Local Rules. Plaintiff does not point to anything in the record to distinguish that particular revision and payment from the many other periodic updates Defendant made after the October 9, 2013 estimate based on the developing information in the months following the fire or that anything more was required of Defendant. (*See e.g.*, DSMF ¶¶ 48, 51, 52, 85, 95, 98, 118 – 19.)

dispute between the insurer and insured as to the meaning of certain policy language" or the amount of certain line items in repair estimates. *Id.* at 767. Accordingly, Defendant is entitled to summary judgment on Plaintiff's UCSPA claim.

## C.    Negligence Claims

In response to Defendant's summary judgment motion, Plaintiff attempted to voluntarily dismiss without prejudice her negligent misrepresentation and negligence claims (Counts III and IV). (Opposition at 4.) Defendant maintains that it is entitled to summary judgment on the claims. Plaintiff, however, is not entitled to dismiss voluntarily either her entire action or less than all her claims at this stage of the proceedings. *See* Fed. R. Civ. P. 41(a)(1) (cannot without court order voluntary dismiss action after answer or motion for summary judgment is filed); *Hells Canyon Preservation Council v. U.S. Forest Service*, 403 F.3d 683, 687 – 90 (9th Cir. 2005) (plaintiff cannot dismiss even with court approval fewer than all claims under Rule 41(a)(2)).

Plaintiff's request is properly considered a motion to amend the complaint in accordance with Federal Rule of Civil Procedure 15. *Hells Canyon*, 403 F.3d at 688-89. A motion to amend that is filed beyond the scheduling order deadline requires an amendment of the scheduling order. To obtain an amendment of the scheduling order, a party must demonstrate "good cause." *Johnson v. Spencer Press of Maine, Inc.*, 211 F.R.D. 27, 30 (D. Me. 2002) (quoting *El–Hajj v. Fortis Benefits Ins. Co.,* 156 F. Supp. 2d 27, 34 (D. Me. 2001)); Fed. R. Civ. P. 16(b)(4). A court's decision on good cause "focuses on the diligence (or lack thereof) of the moving party more than it does on any prejudice to the party-opponent." *Steir v. Girl Scouts of the USA,* 383 F.3d 7, 12 (1st Cir. 2004).

Here, Plaintiff's request is made after lengthy discovery and extensive motion practice. Plaintiff had ample time to amend her pleading to remove the negligence claims prior to Defendant's motion for summary judgment. See *id.* ("Where the motion to amend is filed after the opposing party has timely moved for summary judgment, a plaintiff is required to show substantial and convincing evidence to justify a belated attempt to amend a complaint") (internal quotations omitted). Given the time and resources Defendant has devoted to the defense of the claims, Defendant would be prejudiced if it were deprived at this stage of the proceedings of an opportunity for finality on the negligence claims. To the extent, therefore, Plaintiff seeks to amend her complaint to remove the negligent misrepresentation and negligence claims and thus avoid a determination on the merits of the claims, Plaintiff's request is denied.

As to Defendant's request for summary judgment on Plaintiff's negligent misrepresentation and negligence claims, because Plaintiff did not offer an argument against summary judgment on the claims, Plaintiff has waived the right the challenge summary judgment on the claims. *See Grenier v. Cyanamid Plastics, Inc*., 70 F.3d 667, 678 (1st Cir. 1995) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived . . ."); *Montany v. Univ. of New England*, 858 F.3d 34, 41 (1st Cir. 2017) (failure to assert argument in response to summary judgment motion constitutes abandonment); *Adams v. Universal Underwriters Ins. Co.,* No. 1:10-CV-00146-JAW, 2011 WL 1900043, at *5 (D. Me. May 19, 2011) ("In his Response to Universal's motion for summary judgment, Mr. Adams elected to concentrate solely on the applicability of 24–A M.R.S.A. § 2904 and did not respond to Universal's arguments

concerning Counts II and III. By failing to respond to Universal's motion on these points, Mr. Adams waived the right to challenge a judgment in Universal's favor on these counts."); *Mahmoud v. Jacques*, No. 2:14-CV-255-JHR, 2016 WL 1734076, at *7 (D. Me. Apr. 29, 2016) ("a failure to respond to a movant's bid for summary judgment on certain claims is, in itself, a basis on which to grant summary judgment as to those issues.") Defendant is thus entitled to summary judgment on Plaintiff's negligent misrepresentation and negligence claims.

## CONCLUSION

Based on the foregoing analysis, the Court grants in part and denies in part Defendant's Motion for Summary Judgment. (ECF No. 100.) The Court finds and orders:

1. Summary judgment is entered in favor of Defendant on Plaintiff's breach of contract claim that Plaintiff is entitled to the full repair or replacement cost.

2. Summary judgment is denied on Plaintiff's breach of contract claim that she is entitled to an additional payment under Defendant's contractual obligation to pay the actual cash value of the loss.

3. Summary judgment is entered in favor of Defendant on Plaintiff's breach of contract claim that she is entitled to further payment under Defendant's contractual obligation to pay for the fair rental value of the Property.

4. Summary judgment is entered in favor of Defendant on Plaintiff's claim under Maine's Unfair Claims Settlement Practices Act.

5. Summary judgment is entered in favor of Defendant on Plaintiff's negligent misrepresentation claim.

6.  Summary judgment is entered in favor of Defendant on Plaintiff's negligence claim.

/s/ John C. Nivison<br>U.S. Magistrate Judge

Dated this 4th day of February, 2020.